391 P.3d 1215

**The STATE of Arizona, Appellee,**

v.

**Vernon Edward PELTZ, Appellant.**

**No. 2 CA–CR 2016–0055**

Court of Appeals of Arizona,
Division 2.

Filed March 2, 2017

Mark Brnovich, Arizona Attorney General, Joseph T. Maziarz, Chief Counsel, Phoenix, By Tanja K. Kelly, Assistant Attorney General, Tucson, Counsel for Appellee

Vernon E. Peltz, Tucson, In Propria Persona

Judge Vásquez authored the opinion of the Court, in which Presiding Judge Howard and Chief Judge Eckerstrom concurred.

## OPINION

VÁSQUEZ, Judge:

¶1 After a jury trial, Vernon Peltz was convicted of aggravated assault causing temporary but substantial disfigurement—a lesser-included offense of aggravated assault causing serious physical injury—and assault—a lesser-included offense of aggravated assault with a dangerous instrument. The trial court suspended the imposition of sentence and placed him on concurrent terms of

probation, the longer of which is three years. On appeal, Peltz contends the prosecutor committed misconduct by charging him with aggravated assault causing serious physical injury and the court erred by denying his motion for a judgment of acquittal on that charge because there was only evidence of minor injuries. He also argues the court erred by admitting lay witness opinion testimony and by denying his motions to suppress. For the reasons that follow, we affirm.

### Factual and Procedural Background

¶ 2 We view the facts in the light most favorable to sustaining Peltz's convictions. *See State v. Molina*, 211 Ariz. 130, ¶ 2, 118 P.3d 1094, 1096 (App. 2005). In December 2012, Arizona Department of Public Safety Trooper Saleem Abdullah responded to a motor vehicle accident on Oracle Road in Pima County. Abdullah's investigation revealed that a pickup truck "had left the roadway going northbound, crossed through the center line of the road across opposing traffic," traveled along the dirt shoulder into and out of a ditch, and ultimately crashed into a sign. He observed blood on the driver's side of the vehicle, specifically, on the inside and outside of the door, the seat, the floorboard, and the steering wheel. There was no blood on the passenger's side. He saw emergency medical technicians treating Peltz and Peltz's mother, J.K. Peltz had a cut above his left eye that was bleeding, and he had blood on his hands. J.K. did not have any open cuts or blood on her, but she "complained of numerous pains to medical personnel."

¶ 3 Abdullah also noticed that Peltz had "red, watery eyes, [a] flushed face[,] ... ptosis, which is a drooping of the eyelids," and "an upper body sway." When Abdullah asked Peltz what had happened, Peltz stated that "there was a crash and that, honestly, he had a few drinks."

¶ 4 Medical technicians transported Peltz and J.K. to nearby hospitals. Abdullah followed Peltz to continue his investigation. Once at the hospital, a nurse informed Abdullah that they would be drawing Peltz's blood for medical purposes, and Abdullah requested a sample. Abdullah waited in a common area by the nurses' station outside of Peltz's room. As he did so, Abdullah overheard Peltz talking on his cell phone. Peltz stated he had been leaving a restaurant, where he consumed "a few alcoholic drinks," and he had been driving. Abdullah also heard Peltz confirm to medical personnel that he had been drinking alcohol.

¶ 5 Subsequent testing of Peltz's blood sample revealed a .142 alcohol content. Officers discovered that the truck was registered to Peltz and that J.K.'s driver license had been suspended. J.K.'s injuries included a lacerated spleen and fractures to her spine and eye socket.

¶ 6 A grand jury indicted Peltz for aggravated assault causing serious physical injury to J.K. and aggravated assault of J.K. using a deadly weapon or dangerous instrument (the motor vehicle).[1] As noted above, the jury convicted him of lesser-included offenses for each charge: aggravated assault causing temporary but substantial disfigurement and assault. This appeal followed. We have jurisdiction pursuant to A.R.S. §§ 12–120.21(A)(1), 13–4031, and 13–4033(A)(1).

### Prosecutorial Misconduct

■ ¶ 7 Peltz first argues "the prosecutor committed misconduct by charging aggravated assault with 'serious physical injury' without any reasonable belief that any injuries

---

1. Peltz contends that "[t]he record on appeal is still incomplete or incorrect" because the original indictment is missing. As the appellant, Peltz bears the responsibility of ensuring that the record is complete. *See State v. Mendoza*, 181 Ariz. 472, 474, 891 P.2d 939, 941 (App. 1995). In any event, based on our review of the record, it appears that Peltz was charged originally in Cause No. CR20141009 for driving under the influence of intoxicants (DUI). After the case was remanded to the grand jury, he was indicted for aggravated assault causing serious physical injury in Cause No. CR20143713, and CR20141009 was dismissed. Shortly thereafter, the case was again remanded to the grand jury, which also indicted Peltz for aggravated assault causing serious physical injury in CR20143713. There was then a superseding indictment under Cause No. CR20153351, which added the charge of aggravated assault involving a deadly weapon or dangerous instrument. The trial court consolidated CR20143713 with CR20153351, which is the case before us.

were serious." Although Peltz alleged prosecutorial misconduct in charging him below, it was for different reasons than he now raises on appeal. Specifically, he argued the prosecutor "fail[ed] to adequately investigate the easy to determine status of [his] driving record" or to present to the grand jury "clearly exculpatory evidence ... that showed a witness observed the vehicle leaving [his] house with [J.K.] driving." *See State v. Lopez*, 217 Ariz. 433, ¶ 4, 175 P.3d 682, 683 (App. 2008) (objection on one ground does not preserve issue on another). Accordingly, he has forfeited review for all but fundamental, prejudicial error. *See State v. Henderson*, 210 Ariz. 561, ¶¶ 19–20, 115 P.3d 601, 607 (2005). However, because Peltz has failed to argue the alleged error was fundamental, he has waived review of this issue. *See State v. Moreno-Medrano*, 218 Ariz. 349, ¶ 17, 185 P.3d 135, 140 (App. 2008); *see also State v. Fernandez*, 216 Ariz. 545, ¶ 32, 169 P.3d 641, 650 (App. 2007) (appellate court will not ignore fundamental error if found).

 ¶ 8 Even assuming the argument had not been waived, Peltz cannot establish fundamental error on his claim of prosecutorial misconduct. *See Henderson*, 210 Ariz. 561, ¶¶ 19–20, 115 P.3d at 607. The prosecutor has broad discretion in deciding both whether to charge and which charges to file against a defendant. *State v. Hankins*, 141 Ariz. 217, 221, 686 P.2d 740, 744 (1984). Courts will not interfere with that discretion unless the prosecutor is acting illegally or in excess of his or her powers. *State v. Murphy*, 113 Ariz. 416, 418, 555 P.2d 1110, 1112 (1976). Here, Peltz did not argue that the prosecutor failed to make a fair and impartial presentation in the final remand to the grand jury, *see id.* and the grand jury independently determined that there was probable cause to indict Peltz for aggravated assault involving serious physical injury, *see State v. Coconino Cty. Superior Court*, 139 Ariz. 422, 424, 678 P.2d 1386, 1388 (1984). The prosecutor did not engage in misconduct by seeking an indictment on that charge.

**2.** Peltz does not contend there was insufficient evidence to support his conviction for aggravated assault causing temporary but substantial disfigurement. Accordingly, we do not address this

### Motion for a Judgment of Acquittal

 ¶ 9 In a somewhat related argument, Peltz contends the trial court erred by denying his motion for a judgment of acquittal, pursuant to Rule 20, Ariz. R. Crim. P., on the charge of aggravated assault causing serious physical injury because the state presented insufficient evidence that J.K.'s injuries were serious. However, because Peltz was not convicted of this offense, the issue is moot. *See Pointe Resorts, Inc. v. Culbertson*, 158 Ariz. 137, 140–41, 761 P.2d 1041, 1044–45 (1988) (under mootness doctrine, court should not address issues that no longer exist because of change in factual circumstances). To the extent Peltz believes that, if his Rule 20 motion on the original charge had been granted, the trial court could not have instructed the jury on lesser-included offenses, he is mistaken.[2] *See State ex rel. Thomas v. Duncan*, 216 Ariz. 260, n.7, 165 P.3d 238, 243 n.7 (App. 2007) (noting that, even if judgment of acquittal granted on charged offense, "lesser included offense would still be applicable"); *State v. Miranda*, 198 Ariz. 426, ¶ 9, 10 P.3d 1213, 1215 (App. 2000) (instruction on lesser-included offense proper if supported by evidence).

 ¶ 10 The trial court did not, in any event, err in denying Peltz's Rule 20 motion because there was substantial evidence that J.K. had suffered a "serious physical injury." *See State v. West*, 226 Ariz. 559, ¶¶ 15–16, 250 P.3d 1188, 1191 (2011). "[I]n ruling on a Rule 20 motion, ... a trial court may not re-weigh the facts or disregard inferences that might reasonably be drawn from the evidence." *Id.* ¶ 18. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* ¶ 16, *quoting State v. Mathers*, 165 Ariz. 64, 66, 796 P.2d 866, 868 (1990). "When reasonable minds may differ on inferences drawn from the facts, the case must be submitted to the jury, and the trial judge has

issue. *See State v. Bolton*, 182 Ariz. 290, 298, 896 P.2d 830, 838 (1995) ("Failure to argue a claim on appeal constitutes waiver of that claim.").

no discretion to enter a judgment of acquittal." *State v. Lee*, 189 Ariz. 590, 603, 944 P.2d 1204, 1217 (1997).

¶ 11 The physician who admitted J.K. to the intensive care unit of the hospital testified that, due to the accident, J.K. had suffered a laceration to her spleen, which carried a risk of internal bleeding, a burst fracture of her spine, and an orbital fracture with bruising. He also explained that, because J.K. was eighty-three years old, she was at a greater risk for complications and was less likely to function at the same level of pre-injury independence. Upon her discharge from the hospital several days later, J.K. was placed in a skilled nursing facility. A reasonable jury could have concluded that J.K.'s injuries "create[d] a reasonable risk of death" or "cause[d] serious and permanent disfigurement, serious impairment of health or loss or protracted impairment of the function of any bodily organ or limb." A.R.S. § 13–105(39); *see State v. Mwandishi*, 229 Ariz. 570, ¶ 8, 278 P.3d 912, 913 (App. 2012).

**Lay Witness Opinion Testimony**

■ ¶ 12 Peltz additionally asserts the trial court erred by admitting lay witness testimony from Abdullah "regarding who was driving based upon the blood spatter." We review the admission of evidence for an abuse of discretion. *State v. Dann*, 220 Ariz. 351, ¶ 66, 207 P.3d 604, 618 (2009).

¶ 13 Before trial, Peltz sought to preclude Abdullah from testifying "concerning any opinion that there was blood in the vehicle or that the blood indicates [Peltz] was driving." He argued that Abdullah could not give such testimony "unless he can prove he is an expert in blood spatter." At a hearing, Abdullah testified that he saw blood on the driver's side door, seat, and steering wheel but none on the passenger's side. Abdullah also identified blood on Peltz's forehead and hands, explaining that "[t]he blood [he] saw on the vehicle ... [was] consistent with someone exiting the vehicle from the driver's seat."

¶ 14 Based on that testimony, the state argued that Abdullah would not be testifying as to "blood spatter" but would be explaining his observations of blood, which "he knew ... to be blood based on training[ ] and the fact that he is a human being." The state further asserted that Abdullah was not giving a scientific opinion but was making a "basic human observation," which was proper. In response, Peltz conceded that Abdullah could "testify where he saw the blood" but maintained that he could not "give an opinion as to [whether] the blood pattern indicates who was driving the vehicle." In its under-advisement ruling, the trial court precluded Abdullah during direct examination from stating his opinion that Peltz was driving the vehicle because "it does not fall within expert testimony and it reaches the ultimate issue to be decided by the jury." However, the court ruled that the testimony could "be elicited on redirect if [Peltz] 'opens the door.' "

¶ 15 At trial during cross-examination, defense counsel confirmed that Abdullah did not "see who was driving ... Peltz's vehicle," did not "see how the blood got anywhere on the vehicle," and was not "a forensic expert in blood spatter." Defense counsel also asked whether Abdullah knew if "the blood got there from ... Peltz either driving the vehicle or taking his mother out of the vehicle," to which Abdullah responded that he "did not see the blood get on the vehicle." The state then informed the court that it thought defense counsel had "opened the door" and that it intended to ask Abdullah on redirect "about his conclusions with the blood as to who was driving." Over defense counsel's objection that it "[c]alls for an expert opinion," the court permitted the questioning. Abdullah subsequently testified that, based on the location of the blood on the steering wheel and the driver's side door and given that Peltz was "the only individual" bleeding, "it seems logical ... that [Peltz] was the individual driving the vehicle."

¶ 16 On appeal, Peltz maintains he did not open the door and, consequently, the trial court improperly admitted Abdullah's testimony. He also argues that the testimony could only have been elicited from an expert, which Abdullah was not. Because Abdullah's testimony was proper lay witness testimony, admissible during direct examination, we find no error.

¶ 17 Rule 701, Ariz. R. Evid., provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Thus, when a lay witness is "drawing a reasonable inference from [his] firsthand knowledge and perceptions of a situation," the witness is "competent to voice [his] opinion," *State v. Ayala*, 178 Ariz. 385, 388, 873 P.2d 1307, 1310 (App. 1994), even as to the ultimate issue, *State v. Doerr*, 193 Ariz. 56, ¶ 26, 969 P.2d 1168, 1175 (1998).

¶ 18 Here, Abdullah's opinion that Peltz had been driving the vehicle was based on his perception and not scientific, technical, or specialized knowledge. Specifically, Abdullah's opinion stemmed from his firsthand observations that Peltz was bleeding and J.K. was neither bleeding nor did she have any blood on her person, and that there was blood on the driver's side but not on the passenger's side of the truck. *Cf. Inman v. State*, 281 P.3d 745, ¶ 20 (Wyo. 2012) (detective's opinion of where assault occurred based on her perception of blood trail and location of weapon); *Gavin v. State*, 891 So.2d 907, 969 (Ala. Crim. App. 2003) (investigator's opinion about blood flow "based on common sense, not on novel scientific blood-spatter analysis"). Although Abdullah stated that his conclusion was in part "[b]ased on his training and experience," he also stated that his conclusion was based on "logic[ ]." *See United States v. Vega*, 813 F.3d 386, 394 (1st Cir. 2016) (lay witness may provide opinion "personally acquire[d] through experience, often on the job," if "the product of reasoning processes familiar to the average person in everyday life"), *quoting United States v. Maher*, 454 F.3d 13, 24 (1st Cir. 2006) & *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005).

¶ 19 In addition, Abdullah's testimony assisted the jury in determining a fact in issue—who had been driving the vehicle. *See* A.R.S. §§ 13–1203(A)(1), 13–1204(A)(1), (2). Accordingly, the testimony was admissible under Rule 701, *see Doerr*, 193 Ariz. 56, ¶ 26, 969 P.2d at 1175, and the trial court did not err in admitting it, *see Dann*, 220 Ariz. 351, ¶ 66, 207 P.3d at 618.

## Motions to Suppress

¶ 20 Peltz also contends the trial court erred by denying his motions to suppress his hospital statements and blood test results. "In reviewing a motion to suppress, we consider only the evidence presented at the suppression hearing and view the facts in the light most favorable to sustaining the trial court's ruling." *State v. Gonzalez*, 235 Ariz. 212, ¶ 2, 330 P.3d 969, 970 (App. 2014). We review the trial court's ruling for an abuse of discretion, *State v. Peterson*, 228 Ariz. 405, ¶ 6, 267 P.3d 1197, 1199 (App. 2011), but we review de novo its legal determinations, *State v. Zamora*, 220 Ariz. 63, ¶ 7, 202 P.3d 528, 532 (App. 2009).

### Hospital Statements

¶ 21 Before trial, Peltz moved to suppress all of his statements that Abdullah overheard at the hospital in violation of the Fourth Amendment to the United States Constitution and article II, § 8 of the Arizona Constitution. Peltz argued that he was at the hospital "for treatment of his injuries and had an expectation of privacy concerning his communication while inside the room," including his conversations over his cell phone and with medical personnel.

¶ 22 During the suppression hearing, Abdullah testified that he was not "actively trying to listen in to ... Peltz's room"—he was standing by the nurses' station in a "public passing area," while waiting for a blood sample and completing his paperwork. He also explained that the door to Peltz's room was "[g]enerally" open and that Peltz was speaking "a little louder than normal conversation."

¶ 23 The trial court denied the motion to suppress, reasoning:

With respect to [Peltz's] statements made to medical personnel and overheard by [Abdullah], these statements are not precludable. The Officer was in a common area he and others had a right to be. The Officer was there for a proper purpose to obtain a blood draw, if medical personnel were going to make a medical blood draw. The door to [Peltz's] treatment room was not completely closed, which allowed [Peltz's] statements to be overheard. [Peltz] was talking in a sufficient[ly] loud voice where his statements could be overheard in the common area. Under these circumstances there was no reasonable, objective expectation of privacy.

As to [Peltz's] statement made to someone on the telephone and overheard by [Abdullah], these statements are not precludable. In addition to the analysis for the statements to medical personnel, there is even more reason to find no subjective expectation of privacy by [Peltz], as well as ... no reasonable objective expectation of privacy. [Peltz] admitted medical personnel would go in and out of the treatment room. As a consequence, while on the telephone any medical person could have entered the room and overheard the telephone conversation.

█ ¶ 24 As he did below, Peltz maintains that he had both a subjective and objective expectation of privacy in his conversations in the hospital room and that Abdullah violated his Fourth Amendment right to privacy.[3] In addition, as to his conversation with medical personnel, Peltz asserts that his expectation of privacy was "even more reasonable" because of the physician-patient privilege under A.R.S. § 13–4062(4).

█ ¶ 25 The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV; State v. Huerta, 223 Ariz. 424, ¶ 5, 224 P.3d 240, 242 (App. 2010). A "search" under the Fourth Amendment occurs when an individual's reasonable expectation of privacy is infringed.

United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); State v. Welch, 236 Ariz. 308, ¶ 8, 340 P.3d 387, 390 (App. 2014). We have a two-part test for determining whether a reasonable expectation of privacy exists. See Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). First, an individual must "have exhibited an actual (subjective) expectation of privacy," and, second, the expectation must "be one that society is prepared to recognize as 'reasonable.'" Id.; accord State v. Adams, 197 Ariz. 569, ¶¶ 17, 20, 5 P.3d 903, 906–07 (App. 2000) (describing first question as subjective and second as objective). Moreover, even if a search is unconstitutional, we will not reverse a conviction if the error in admitting evidence obtained as a result of that search was harmless. See State v. Hickman, 205 Ariz. 192, ¶ 29, 68 P.3d 418, 424 (2003); see also Henderson, 210 Ariz. 561, ¶ 18, 115 P.3d at 607 ("Harmless error review places the burden on the state to prove beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence.").

█ ¶ 26 As to Peltz's cell phone conversation, which included his statement that he had been driving after drinking alcohol, Peltz did not exhibit a subjective expectation of privacy. For this analysis, we must consider Peltz's conduct. See State v. Steiger, 134 Ariz. 268, 272, 655 P.2d 808, 812 (App. 1982). Abdullah testified that the door to Peltz's room was "[g]enerally" open, as medical personnel were going in and out. And Peltz never asked for the door to be shut while he was on the phone. Abdullah also testified that Peltz was talking "a little louder than normal conversation." Cf. United States v. Martin, 509 F.2d 1211, 1214 (9th Cir. 1975) (defendants defeated expectation of privacy by exposing their activities to others).

¶ 27 Even if Peltz had a subjective expectation of privacy, the trial court did not err in finding it is not one society would recognize as reasonable. Participants of a conversation

3. Peltz does not re-urge his argument with respect to article II, § 8. We therefore deem any such argument waived. See Bolton, 182 Ariz. at 298, 896 P.2d at 838. In any event, the right of privacy under article II, § 8 has not been expanded beyond that provided by the Fourth Amendment, except in cases involving unlawful, warrantless home entries. State v. Teagle, 217 Ariz. 17, n.3, 170 P.3d 266, 271 n.3 (App. 2007).

that can be readily overheard by someone standing in a public place have a lesser expectation of privacy. *See United States v. Scott*, 975 F.2d 927, 930 (1st Cir. 1992); *United States v. Muckenthaler*, 584 F.2d 240, 245 (8th Cir. 1978). This is true even in the context of the physician-patient privilege. Information is privileged when acquired by a physician or surgeon in a consultation with the patient under circumstances in which "it is intended that the communication be private and confidential." *State v. Beaty*, 158 Ariz. 232, 239–40, 762 P.2d 519, 526–27 (1988) ("The presence of third parties can eliminate the confidential character of the [communication] and destroy the privilege."); *see also State v. Thomas*, 78 Ariz. 52, 63, 275 P.2d 408, 416 (1954), *overruled in part on other grounds by State v. Pina*, 94 Ariz. 243, 245, 383 P.2d 167, 168 (1963). Peltz's reliance on *Katz* is thus misplaced.

¶ 28 In *Katz*, federal agents had attached an electronic listening and recording device to the outside of a phone booth. 389 U.S. at 348, 88 S.Ct. 507. They then testified at the defendant's trial as to the defendant's conversations from that booth, which they overheard because of the electronic device. *Id.* The Supreme Court concluded that the agents had violated the defendant's Fourth Amendment right because he "justifiably relied" on his privacy in the booth and the search did not comply with the necessary constitutional "safeguards." *Id.* at 353–54, 88 S.Ct. 507.

¶ 29 Here, unlike the federal agents in *Katz*, Abdullah used no electronic device and merely overheard Peltz's conversation while standing in a public area of a hospital, as could anyone else at that location. *See id.* at 361, 88 S.Ct. 507 (Harlan, J., concurring) ("[C]onversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable."); *United States v. Scott*, 731 F.3d 659, 664 (7th Cir. 2013) ("[A]n individual who makes a phone call on a public phone not enclosed in a booth and in a voice audible to a person standing nearby 'knowingly expose[s] [the conversation] to the public' and is not entitled to Fourth Amendment protection."), *quoting*

*United States v. McLeod*, 493 F.2d 1186, 1188 (7th Cir. 1974) (alterations in *Scott*). Nor does the fact that Peltz had been using his personal cell phone during the conversation change our analysis—Peltz was still in an open hospital room, and Abdullah was standing in a public area. The trial court therefore did not err by denying Peltz's motion to suppress with respect to his cell phone conversation. *See Zamora*, 220 Ariz. 63, ¶ 7, 202 P.3d at 532.

■ ¶ 30 As for Peltz's conversation with medical personnel, even assuming the trial court erred in denying the motion to suppress, any resulting error was harmless. At issue here is Abdullah's testimony that he heard Peltz tell the hospital staff that he had been drinking alcohol. However, that evidence was "otherwise established." *State v. Bass*, 198 Ariz. 571, ¶ 40, 12 P.3d 796, 806 (2000). Abdullah testified that when he arrived at the scene Peltz had "red, watery eyes, a flushed face," and an "upper body sway." Both Abdullah and the criminalist who tested Peltz's blood sample confirmed that those were signs of alcohol impairment. *See State v. Nelson*, 146 Ariz. 246, 249, 705 P.2d 486, 489 (App. 1985) (erroneous admission of breathalyzer test results harmless given officers' observations and defendant's conduct). Perhaps most notably, Peltz told Abdullah at the accident scene and also testified at trial that he had been drinking before the accident. We are therefore confident beyond a reasonable doubt that any error did not contribute to or affect the verdict. *See Henderson*, 210 Ariz. 561, ¶ 18, 115 P.3d at 607.

**Blood Test Results**

■ ¶ 31 Peltz also sought to suppress the blood test results, arguing that Abdullah lacked probable cause or a warrant, in violation of the Fourth Amendment to the United States Constitution and article II, § 8 of the Arizona Constitution. He also argued that, because there were no exigent circumstances and "[t]here was no medical purpose for blood testing," the medical blood draw excep-

tion to the warrant requirement under A.R.S. § 28–1388(E) did not apply.[4]

¶ 32 At the suppression hearing, Abdullah testified, "When I got to the hospital, I determined the hospital was going to be drawing blood for medical purposes, and under statute, I requested a sample of that blood." He said that no one told him "the medical necessity for taking blood," apparently because it would "violate[ ] some sort of HIPAA rule."[5] The trial court denied Peltz's motion to suppress, explaining:

> This issue is governed by A.R.S. § 28–1388(E). In this case the evidence supports the finding of probable cause by Officer Abdullah at the time he requested a portion of [Peltz's] blood from medical personnel, who were already going to take a blood draw from [Peltz] for their own use.

¶ 33 As he did below, Peltz maintains Abdullah lacked probable cause or a warrant and, therefore, violated his federal and state constitutional rights. Peltz argues that, at the time of the blood draw, Abdullah lacked probable cause because "[t]he information concerning [his] driving was discovered after the draw while [Abdullah] was secretly listening to conversations." Peltz also asserts, "[T]here were no exigent circumstances," and "[t]here is no evidence in the record that shows why the blood was being drawn, much less any evidence which established that the blood was drawn for a medical purpose." We disagree.

■ ¶ 34 Section 28–1388(E) provides:

> Notwithstanding any other law, if a law enforcement officer has probable cause to believe that a person has violated [A.R.S.] § 28–1381 and a sample of blood, urine or other bodily substance is taken from that person for any reason, a portion of that sample sufficient for analysis shall be provided to a law enforcement officer if requested for law enforcement purposes.

Thus, under § 28–1388(E), a warrantless blood draw seizure is permissible "if (1) probable cause existed to believe that the person was driving under the influence, (2) exigent circumstances were present, and (3) the blood was drawn by medical personnel for a medical reason." *State v. Nissley*, 241 Ariz. 327, ¶ 10, 387 P.3d 1256, 1259 (2017). We address each of these factors in turn.

■ ¶ 35 The trial court did not err in finding Abdullah had probable cause to believe Peltz had been driving under the influence of an intoxicant. "A police officer has probable cause when reasonably trustworthy information and circumstance would lead a person of reasonable caution to believe that a suspect has committed an offense." *State v. Hoskins*, 199 Ariz. 127, ¶ 30, 14 P.3d 997, 1007–08 (2000). In the DUI context, an officer is only required to show the probability that the operator was under the influence, not that he actually was. *State v. Moran*, 232 Ariz. 528, ¶ 10, 307 P.3d 95, 99 (App. 2013). When Abdullah arrived at the scene of the single car crash, he noticed that Peltz "smelled strongly of an intoxicating beverage," and he observed that Peltz had "red, watery eyes, a flushed face, ptosis, ... which is droopy eyelids," and an "upper body sway." When Abdullah asked Peltz what happened, he acknowledged "there was a crash" but did not say how it occurred. He stated, "Honestly, I've had a few drinks, and I don't think I should talk to you." Abdullah also testified that he saw blood on the driver's side door, seat, and steering wheel, as well as Peltz's forehead and hands, explaining that "[t]he blood [he] saw on the vehicle ... [was] consistent with someone exiting the vehicle from the driver's seat."

¶ 36 Turning next to whether exigent circumstances were present, Abdullah testified that Peltz was transported by ambulance to the hospital for treatment.[6] Abdullah agreed,

---

4. Peltz also challenged the constitutionality of A.R.S. §§ 28–1388(E) and 28–1390. However, he does not raise these arguments on appeal. We thus do not consider them further. *See Bolton*, 182 Ariz. at 298, 896 P.2d at 838.

5. Abdullah was referring to the Health Insurance Portability and Accountability Act. The act's privacy rule requires a detailed authorization for

uses and disclosures of protected health information. *See* 45 C.F.R. § 164.508(c).

6. To prove DUI with an elevated blood alcohol content pursuant to § 28–1381(A)(2), the state must establish "the person has an alcohol concentration of 0.08 or more within two hours of driving or being in actual physical control of the vehicle." Thus, the timing of a blood draw is an

based on his previous experience, that persons can be transported to a hospital for a "wide variety of things," which include surgery, computerized tomography (CT) scans, x-rays, or treatment that involves isolating the person "for whatever reason." Abdullah testified that, when he learned the hospital would be drawing Peltz's blood, he did not know the scope or extent of any further medical treatment. He stated that, based on his training as a "combat life saver in the military," he was aware of the possibility of the "intravenous application of fluids," which would "alter an individual's blood alcohol concentration" and "essentially destroy whatever evidence was available." Thus, the state met its burden of showing exigent circumstances. *See Nissley*, 241 Ariz. 327, ¶ 15, 387 P.3d at 1260 (state bears burden of proof for medical blood draw exception).

¶ 37 As to the final factor, we agree with the trial court's determination that Peltz's blood had been drawn by medical personnel for a medical purpose. "The State, as the party seeking to admit evidence seized without a warrant, had the burden of establishing the medical blood draw exception's applicability to these facts." *State v. Spencer*, 235 Ariz. 496, ¶ 12, 333 P.3d 823, 826 (App. 2014). It was sufficient for the state to show that Abdullah neither requested the hospital to perform the blood draw nor directed it to do so. In other words, it was only necessary for the state to establish the hospital made an independent medical decision to draw Peltz's blood. At the suppression hearing, Abdullah testified that, when he arrived at the hospital, he asked whether "the hospital was going to be drawing blood for medical purposes, and under statute, [he] requested a sample of that blood." Peltz has not cited any authority, and we are aware of none, for the proposition that the state was required to establish the hospital's medical reason for the blood draw.

Peltz also does not argue his medical treatment at the hospital was involuntary. *See State v. Estrada*, 209 Ariz. 287, ¶ 15, 100 P.3d 452, 456 (App. 2004) (medical blood draw exception does not apply "when a person is receiving medical treatment against his or her will"). The court did not err by denying Peltz's motion to suppress with respect to his blood test results. *See Zamora*, 220 Ariz. 63, ¶ 7, 202 P.3d at 532.

### Disposition

¶ 38 For the reasons stated above, we affirm Peltz's convictions and sentences.

important concern in such cases. In *State v. Cocio*, 147 Ariz. 277, 286, 709 P.2d 1336, 1345 (1985), our supreme court concluded that exigent circumstances existed, for purposes of the medical blood draw exception to the warrant requirement, given that "[t]he highly evanescent nature of alcohol in the defendant's blood stream guaranteed that the alcohol would dissipate over a relatively short period of time." However, the court recently "disavow[ed]" any suggestion in *Cocio* that there was a "per se exigency" based on "the natural dissipation of alcohol in the bloodstream." *Nissley*, 241 Ariz. 327, ¶ 11, 387 P.3d at 1259; *see also Missouri v. McNeely*, 569 U.S. 141, 155–56, 133 S.Ct. 1552, 1563, 185 L.Ed.2d 696 (2013) ("[W]hile the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, ... it does not do so categorically.").