NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

RAMIN KHORRAMI, *Appellant*.

No. 1 CA-CR 20-0088
FILED 7-29-2021

Appeal from the Superior Court in Maricopa County
No. CR2015-002870-001
The Honorable Geoffrey H. Fish, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michelle L. Hogan
*Counsel for Appellee*

Coleman & Balogh LLP, San Diego, California
By Benjamin Lee Coleman, appearing *Pro Hac Vice*
*Co-Counsel for Appellant*

Papetti Samuels Weiss LLP, Scottsdale
By Bruce E. Samuels
*Co-Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge David B. Gass delivered the decision of the Court, in which Judge Michael J. Brown and Judge David D. Weinzweig joined.

---

**G A S S**, Judge:

¶1　　　　Ramin Khorrami appeals his convictions and the resulting suspensions of sentences for one count of fraudulent schemes and artifices and one count of theft. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2　　　　This court reviews the facts in the light most favorable to sustaining the jury's verdict, resolving all reasonable inferences against Khorrami. *See State v. Felix*, 237 Ariz. 280, 283, ¶ 2 (App. 2015). We use pseudonyms for the victims to protect their privacy. *See, e.g.*, *State v. Bolivar*, 250 Ariz. 213, 217, ¶ 2 n.1 (App. 2020).

¶3　　　　Pearl and Khorrami met in May 2012. Pearl told Khorrami she lived in Phoenix with her husband, Trey, and worked in real estate. Khorrami told Pearl he lived in Los Angeles and offered to help her find real estate clients there. They exchanged phone numbers. After Pearl returned home, she and Khorrami regularly exchanged flirtatious text messages and often spoke on the phone. When Pearl visited Khorrami a few months later, they began a sexual relationship. Over the next few months, Pearl frequently travelled to spend time with Khorrami. Pearl told Khorrami she planned to leave Trey, and the two discussed a future together.

¶4　　　　Over time, Khorrami became jealous and paranoid. He accused Pearl of having affairs with other men, demanded she send him photographs throughout the day to show her location, and told her he hired a private investigator to follow her. Later, Pearl angered Khorrami when she decided to remain in her marriage. In response, he threatened to reveal their affair to Trey. They then mended their relationship, and Khorrami did not carry out his threat.

¶5　　　　In June 2013, after another falling-out, Khorrami accused Pearl of repeatedly lying to him and again threatened to reveal their affair to Trey. Pearl pleaded with him not to do so, and he agreed to delay telling

Trey while he thought about what to do. Khorrami called Pearl a few days later and promised not to reveal the affair if she paid him $40,000.

¶6      After Khorrami's money-for-silence proposal, Pearl began secretly recording their phone calls. When Pearl next spoke with Khorrami, they negotiated the terms. He agreed to accept $30,000, which she would pay in multiple installments over a month. He required her to put a false comment on the checks saying "Rose gold Rolex" and indicating the remaining amount she owed. Khorrami sent Pearl text messages saying she had "20 days to finish your deal, not one day more" and his "only communication with [her] will be regarding [their] deal till [*sic*] the end of July."

¶7      The day they agreed to their deal, Pearl mailed Khorrami a $5,000 check with the false comment. After Khorrami received the first payment, he added to his demands. He told Pearl to call him every morning, send pictures showing her location throughout the day, and refrain from sexual relations with anyone except him. When Pearl at times did not comply, he sent her text messages saying the "deal is off" and the "deal is going to change." He demanded an additional $10,000 after she failed to answer a phone call. Khorrami eventually withdrew that demand.

¶8      A week after sending the first check, Pearl mailed Khorrami a $2,000 check, then later a third check for the remaining amount of $23,000. Khorrami rejected the final payment because Pearl did not include the false comment on the check. At his demand, she sent another check with the false comment. After receiving the fourth check, Khorrami demanded Pearl pay $40,000 more and continue their sexual relationship, again threatening to disclose the affair to Trey if she did not comply.

¶9      Pearl gave Khorrami another $4,000, but she also realized Khorrami's additional demands would never end and he never intended to keep his side of the bargain. As a result, Pearl told Trey about the affair in November 2013. The next day, Khorrami told Trey about the affair and Pearl's affairs with other men. Trey reported Khorrami to the police, and Pearl and Trey filed a civil lawsuit against Khorrami.

¶10      The State ultimately tried Khorrami for one count of fraudulent schemes and artifices, a class 2 felony, and theft, also a class 2 felony. After a twelve-day trial, the jury convicted Khorrami on both counts. The superior court entered judgments of conviction, suspended Khorrami's sentence, and placed him on concurrent two-year terms of supervised probation. The superior court also imposed a two-month jail

term. Khorrami timely appealed. This court has jurisdiction under article VI, section 9, of the Arizona Constitution, and A.R.S. §§ 13-4031 and 13-4033.A.1.

## ANALYSIS

### I. Sufficiency of the Evidence

¶11        Khorrami first argues his convictions lack sufficient evidence. Citing *Fasulo v. United States*, 272 U.S. 620 (1926), and *Norton v. United States*, 92 F.2d 753 (9th Cir. 1937), he asserts the statutes underlying his convictions "were not meant to govern the circumstances of this case."

¶12        This court reviews *de novo* whether sufficient evidence supports a conviction. *State v. Pena*, 235 Ariz. 277, 279, ¶ 5 (2014). Evidence is sufficient if the record contains "substantial evidence" of guilt, meaning evidence "reasonable persons could accept as sufficient to support a guilty verdict beyond a reasonable doubt." *Id.* (citation omitted). "Reversible error based on insufficiency of the evidence occurs only [when] there is a complete absence of probative facts to support the conviction." *State v. Soto-Fong*, 187 Ariz. 186, 200 (1996) (quoting *State v. Scott*, 113 Ariz. 423, 424–25 (1976)).

¶13        "Evidence is not insubstantial simply because testimony is conflicting or reasonable persons may draw different conclusions from the evidence." *State v. Toney*, 113 Ariz. 404, 408 (1976). This court will not "reweigh evidence or reassess the witnesses' credibility." *State v. Buccheri-Bianca*, 233 Ariz. 324, 334, ¶ 38 (App. 2013). In its review, this court does not distinguish between circumstantial and direct evidence. *State v. Bible*, 175 Ariz. 549, 560 n.1 (1993). Jurors usually must "infer [a defendant's mental state] from [the defendant's] behaviors and other circumstances surrounding the event." *State v. Noriega*, 187 Ariz. 282, 286 (App. 1996).

¶14        To support Khorrami's fraudulent-schemes-and-artifices conviction, substantial evidence in the record must show: (1) pursuant to a scheme or artifice to defraud; (2) Khorrami knowingly obtained any benefit from the victim(s); (3) by means of false or fraudulent pretenses, representations, promises, or material omissions. A.R.S. § 13-2310.A; *see State v. Haas*, 138 Ariz. 413, 418–24 (1983) (describing statutory elements under an earlier version of the fraud statute). "Reliance on the part of any person" is not an element of the offense. A.R.S. § 13-2310.B. The superior court instructed the jurors "the State must prove that the scheme or artifice to defraud was intended to defraud, meaning it was intended to mislead another person for the purpose of gaining some benefit."

4

¶15        The fraudulent-schemes-and-artifices statute is meant to "encompass[] a very broad range of fraudulent activities." *Haas*, 138 Ariz. at 422 (citation omitted). Section 13-2310.A is violated "when [a] defendant has knowingly [mis]led the adverse party . . . by active misrepresentations, or omitting material facts which defendant knew were being misunderstood, or by stating half-truths, or by any combination of these methods." *Id.* at 423.

¶16        To convict on the theft charge, the superior court instructed the jurors the State had to prove Khorrami, without lawful authority, knowingly obtained the victims' "U.S. currency of a value of $25,000 or more, but less than $100,000" by means of any material misrepresentation, with the intent to deprive them of such currency. *See* A.R.S. § 13-1802.A.3. Material misrepresentation means "a pretense, promise, representation or statement of present, past or future fact that is fraudulent and that, when used or communicated, is instrumental in causing the wrongful control or transfer of property or services." A.R.S. § 13-1801.A.8.

¶17        The record contains ample evidence from which a reasonable juror could conclude Khorrami obtained money from Pearl under the false pretense he would not reveal their affair to Trey. Pearl repeatedly testified she believed she was buying Khorrami's silence on the affair when they agreed to the initial, negotiated payment of $30,000. She described in detail how he led her to have that belief. She recounted the terms of their deal and her compliance with them, despite Khorrami's ever-changing demands. And Pearl finally disclosed the affair to Trey once she was convinced Khorrami had deceived her.

¶18        Pearl's testimony, together with reasonable inferences, alone is sufficient to support the jury's verdicts. *See State v. Felix*, 234 Ariz. 118, 120–21, ¶ 10 (App. 2014) (affirming conviction based on single witness's testimony). The State further corroborated Pearl's account with evidence of phone calls and text messages between Pearl and Khorrami in which they discussed the arrangement and its terms. And Khorrami took the money from Pearl, spent it soon afterward, and made additional demands before ultimately revealing the affair to Trey.

¶19        A reasonable juror could infer Khorrami required Pearl to include the false comment on the checks from the outset so he could later reveal the affair but still say he obtained the money legitimately. Khorrami's additional demands to maintain his silence after Pearl paid the agreed-upon $30,000 bolstered the inference Khorrami's intent was to extract as much money as he could before he ultimately revealed the affair.

¶20        Based on the above evidence, a reasonable jury could decide Khorrami purposely misled Pearl to believe a false state of facts: if she paid him $30,000, he would not reveal their affair. At the very least, reasonable minds could disagree on the point. *See Toney*, 113 Ariz. at 408. Accordingly, sufficient evidence supports his convictions.

¶21        Khorrami counters that he merely threatened Pearl, which is not actionable fraud under *Fasulo* and *Norton*. We are not persuaded. Those cases interpret a federal mail fraud statute to require an intent to deceive but do not suggests a fraud conviction cannot stand simply because it is accompanied by a threat. *See State v. Johnson*, 179 Ariz. 375, 381 (1994) ("This is not to say that a crime can never satisfy the overlapping elements of both theft and fraud."). Those cases do not change our conclusion. The evidence here was sufficient.

## II.    Jury Instructions

¶22        For the first time on appeal, Khorrami challenges the jury instructions given for the charged offenses. First, Khorrami argues the fraudulent-schemes-and-artifices instruction failed to require proof of "materiality." Second, he asserts the theft-by-misrepresentation instruction should have required proof of justifiable reliance. Fundamental-error review applies because Khorrami did not object to the instructions at trial. *See State v. Gomez*, 211 Ariz. 494, 499, ¶ 20 (2005).

¶23        To obtain relief on fundamental-error review, a defendant first must show "trial error exists." *State v. Escalante*, 245 Ariz. 135, 142, ¶ 21 (2018). If error exists, the defendant then must establish the error: (1) went to the foundation of the case; (2) took away a right essential to the defense; or (3) was so egregious the defendant could not possibly have received a fair trial. *Id.*

¶24        Here, the instructions tracked the applicable statutory language. *See* A.R.S. §§ 13-1802.A.3, -2310.A; *see also* Rev. Ariz. Jury Instr. Stat. Crim. 18.02.01, 23.10 (5th ed. 2019). And the fraudulent-schemes-and-artifices instruction was nearly identical to the instruction endorsed by the Arizona Supreme Court. *See State v. Bridgeforth*, 156 Ariz. 60, 64–65 (1988). Khorrami fails to carry his burden to show the superior court erred.

¶25        For the same reasons, we reject Khorrami's argument the superior court erred by failing to *sua sponte* instruct the jurors: (1) a breach of contract does not constitute fraud, even if intentional; (2) the State had to prove Khorrami did not intend to keep his promise at the time he made it; and (3) a "heightened intent requirement cannot be met" by a defendant's

failure to perform. *See State v. Doerr*, 193 Ariz. 56, 65, ¶ 35 (1998) ("Where the law is adequately covered by instructions as a whole, no reversible error has occurred.").

¶26 Without citing any Arizona authority, Khorrami relies on several federal cases addressing the materiality requirement in the federal mail-fraud, wire-fraud, and bank-fraud statutes to assert the State must prove materiality for all means of committing a violation of § 13-2310.A. Those decisions are not controlling here. *See Phoenix Newspapers, Inc., v. Reinstein*, 240 Ariz. 442, 449, ¶ 25 (App. 2016) (decisions of federal circuit courts may be persuasive authority but are not binding on Arizona courts).

¶27 Unlike the federal mail-fraud statute, which is silent on materiality, our legislature expressly included a "material" requirement in § 13-2310.A and only applied the requirement to "omissions." The United States Supreme Court held "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes" *because*, in part, those statutes neither defined "scheme or artifice to defraud" nor "even mention[ed] materiality." *Neder v. United States*, 527 U.S. 1, 20–25 (1999). The Supreme Court said the absence of an express reference to materiality in the federal fraud statutes indicated Congress's intent to incorporate the common-law meaning of fraud, which includes materiality. *Id.* Arizona's statute is different.

¶28 Khorrami's suggested interpretation would render superfluous the materiality element set forth in § 13-2310.A. *See City of Tucson v. Clear Channel Outdoor, Inc.*, 209 Ariz. 544, 552, ¶ 31 (2005) ("[W]e do not interpret statutes in such a manner as to render a clause superfluous."). Khorrami invites us to impose a requirement the legislature expressly chose not to require, which this court will not do. *See Hart v. Hart*, 220 Ariz. 183, 187, ¶ 17 (App. 2009).

¶29 Finally, this court has previously rejected Khorrami's argument a theft-by-misrepresentation conviction requires justifiable reliance. *See State v. Schneider*, 148 Ariz. 441, 444–45 (App. 1985). We discern no reason on this record to reconsider that decision.

### III. Asserted Insufficient Notice

#### A. Indictment

¶30 Khorrami argues the indictment was fatally defective and lacked sufficient notice because it "simply tracked the statutory language and did not even identify the false promise or pretense that formed the basis

of the two charges." But Khorrami filed pretrial motions to dismiss the indictment and never objected on the grounds he asserts now. Criminal defendants are barred on appeal from challenging an alleged facial defect in an indictment when they fail to make a proper objection before the superior court. *State v. Anderson*, 210 Ariz. 327, 335–36, ¶¶ 14–17 (2005).

¶31        Even absent waiver, we find no error. "An indictment is legally sufficient if it informs the defendant of the essential elements of the charge, is definite enough to permit the defendant to prepare a defense against the charge, and affords the defendant protection from subsequent prosecution for the same offense." *State v. Far W. Water & Sewer Inc.*, 224 Ariz. 173, 187, ¶ 36 (App. 2010); *see State v. Mallory*, 19 Ariz. App. 15, 18 (1972) (charging document tracking statutory language generally provides sufficient notice). Defendants must receive "actual notice of the charges, from either the indictment or other sources." *State v. Freeney*, 223 Ariz. 110, 115, ¶ 29 (2009).

¶32        The indictment was sufficiently specific. It tracked the elements of the charged offenses, provided the statutory citations, identified the victims, and listed the dates of the offenses and the county where they occurred. Khorrami received notice of the factual allegations from the grand jury transcript, joint pretrial statements, and pretrial disclosures. *See Freeney*, 223 Ariz. at 114, ¶ 27 (listing other sources of notice). Indeed, Khorrami recounted the factual allegations in his dismissal motions. Accordingly, Khorrami received actual notice. *See id.*

### B.    Rebuttal Closing Argument

¶33        In this appeal, Khorrami for the first time argues the prosecutor's statement in rebuttal closing argument was a new liability theory, impermissibly amending the indictment and risking a non-unanimous verdict:

> So whether you believe that the misrepresentation took place the first time, the second time, the third time, the fourth time, whatever time that you think that he misrepresented and he was getting all this money, that's a misrepresentation. If you believe that the first time he said $30,000 for silence, do you believe that he was really going to stay silent that time? Okay. But do you believe it the second time? Do you believe it with the $40,000? Do you believe it with the sexual demands? During that time period if you believe he misrepresented this one time, then that's enough for that element.

Because Khorrami failed to object at trial, this court reviews for fundamental, prejudicial error. *See Escalante*, 245 Ariz. at 140, ¶ 12.

¶34        "Unless the defendant consents, a charge may be amended only to correct mistakes of fact or remedy formal or technical defects. The charging document is deemed amended to conform to the evidence admitted during any court proceeding." Ariz. R. Crim. P. 13.5(b). The evidence and jury instructions constructively amend an indictment if they "modify essential terms of the charged offense" and cause "a substantial likelihood that the jury may have convicted the defendant for [a different] offense." *United States v. Daraio*, 445 F.3d 253, 259–60 (3rd Cir. 2006); *see also State v. Lua*, 237 Ariz. 301, 305–06, ¶¶ 15–18 (2015) (reviewing whether jury instructions constructively amended indictment).

¶35        Nothing in the record suggests the prosecutor sought to amend the indictment by making the challenged remarks. The elements of the offenses submitted to the jury were identical to those of the charged offenses. *See Freeney*, 223 Ariz. at 113, ¶¶ 15–20. This court presumes jurors follow the instructions they are given. *State v. LeBlanc*, 186 Ariz. 437, 439 (1996). For that reason alone, we reject Khorrami's argument the State violated Rule 13.5(b).

¶36        Moreover, the prosecutor did not urge conviction on an improper basis. The State's theory before and during trial was Khorrami had a single scheme he implemented through a series of ongoing transactions and he always intended to disclose the affair. *See State v. Suarez*, 137 Ariz. 368, 373 (App. 1983) ("A scheme to defraud thus implies a plan, and numerous acts may be committed in furtherance of that plan."). The State pointed to Khorrami's actions after making the agreement to further demonstrate his fraudulent promissory intent.

¶37        And the record belies Khorrami's complaint he had no notice of the culpability theory he now protests. The day before the jury was empaneled, during a hearing on trial issues, Khorrami sought and received clarification from the State on the terms allegedly constituting the agreement. Khorrami's contention that he lacked notice is unfounded. *See Freeney*, 223 Ariz. at 115, ¶ 29; *see also State v. Eastlack*, 180 Ariz. 243, 258 (1994) ("Defendant is entitled to notice of the crimes with which he may be convicted, not the manner in which the [S]tate will prove his guilt.").

## IV.    Victim Testimony

¶38        Khorrami challenges the admission of what he alleges are "victim-impact" and "victim-opinion" testimony. This court generally

reviews a superior court's evidentiary rulings for abuse of discretion. *State v. Dann*, 220 Ariz. 351, 365, ¶ 66 (2009). But because Khorrami did not object, fundamental-error review applies. *See Escalante*, 245 Ariz. at 140, ¶ 12.

### A.    Asserted Victim-Impact Testimony

**¶39**       Khorrami argues the superior court improperly allowed the State to elicit testimony from the victims describing how the offenses personally affected them. We disagree.

**¶40**       Khorrami's defense was he never entered into any agreement with Pearl, arguing she fabricated its existence and manipulated Trey into believing Khorrami exploited her. Khorrami's counsel explained the defense's theory to the jurors in opening statement: Pearl and Trey sought revenge against Khorrami.

**¶41**       To support that theory, defense counsel cross-examined Pearl about her reasons for disclosing the affair to Trey when Khorrami had not done so. Defense counsel then asked why she would pursue criminal charges and a civil lawsuit against Khorrami, and not just "let sleeping dogs lie?" Pearl said she had a "mental breakdown" from the experience, which led Trey to report Khorrami to the police.

**¶42**       On redirect examination, the prosecutor asked Pearl to explain "why [she] couldn't let sleeping dogs lie." She answered she "endured so much pain and suffering" and "almost died." She continued, "I wouldn't be alive if my husband didn't make sure I was okay and fed me. I really suffered and there's a lot of this stuff what he did that's not covered in this case." Khorrami did not object.

**¶43**       While cross-examining Trey, defense counsel asked, "How much are you hoping to get from the civil lawsuit?" Trey replied he sought only justice, not money. Defense counsel also questioned why Trey, and not Pearl, had contacted the police and a civil attorney.

**¶44**       On redirect examination, the prosecutor asked Trey to explain why he, not Pearl, reported Khorrami to the police. Trey said "[Pearl] was unable to. She was completely incapable of doing anything. She wouldn't remember anything. She would be very fearful. Every day she locked the door. [He's] going to come after me to kill me." Khorrami objected to this response. Over Khorrami's objection, Trey testified he had to help Pearl deal with the effects of the experience, which in turn affected his career.

¶45        When a party "open[s] the door" and invites later, generally objectionable testimony, no error occurs if the other party's response is "pertinent," meaning "specifically responsive to the invitation." *State v. Leyvas*, 221 Ariz. 181, 189, ¶ 25 (App. 2009) (citations omitted). Khorrami's opening statement and cross-examination suggested the victims reported Khorrami to the police and filed a civil claim against him for money and revenge. Khorrami opened the door to rebuttal testimony on those subjects, making the victims' reasons for their actions relevant. We find the questions and answers sufficiently responsive to Khorrami's invitation. *See id.* at ¶¶ 25–26. The superior court did not err.

### B.        Religious References

¶46        Khorrami contends the State improperly elicited testimony from the victims concerning religious beliefs to "demonize" him and to portray the victims sympathetically. Specifically, he points to: (1) Trey's testimony he was initially attracted to Pearl in part because she was interested in his religious faith; (2) Pearl's testimony Khorrami and Trey share Persian heritage; and (3) Pearl's testimony she and Khorrami envisioned a future together despite their different religious faiths. Khorrami did not object to any of the cited instances.

¶47        Assuming without deciding the isolated remarks constituted fundamental error, Khorrami fails to establish prejudice. He merely speculates the remarks "likely added to the improper prejudice that tainted the fairness of Mr. Khorrami's trial." Speculative prejudice is insufficient to prevail on fundamental-error review. *See Escalante*, 245 Ariz. at 142, ¶ 21 (showing prejudice "involves a fact-intensive inquiry" (citation omitted)).

¶48        Moreover, the jurors learned of far more pertinent evidence about Khorrami's conduct. The jurors heard recorded phone calls in which Khorrami repeatedly insulted Pearl using demeaning and profane language. Pearl testified at length about the derogatory way he spoke to her. Khorrami even conceded his demeaning conduct. In closing argument, defense counsel told the jurors, "[Khorrami's] an asshole. Okay? The way that he spoke to [Pearl] is absolutely reprehensible and indefensible . . . . It was disgusting, right? . . . He's an ass." Admitting the testimony, therefore, did not deprive Khorrami of a fair trial by prejudicing the jury against him. *See State v. Weatherbee*, 158 Ariz. 303, 305 (App. 1988) (improperly admitted evidence may be harmless when it is "entirely cumulative").

## C.    Alleged Improper Opinion Testimony

**¶49**        On redirect examination, the prosecutor asked Pearl the following:

Q: In your line of work, you know when people want to come to a deal, right?

A: Yes.

Q: From everything that you experienced, did the defendant ever want this -- ever intend on this deal staying in place?

A: Retrospectively looking at it, no.

Q: What do you feel like he wanted?

[Defense counsel]: Objection, speculation.

THE COURT: Overruled.

A: Revenge.

**¶50**        Khorrami argues the testimony constituted an improper opinion. Fundamental-error review applies because Khorrami did not object at trial on the ground he asserts on appeal. *Escalante*, 245 Ariz. at 140, ¶ 12.

**¶51**        "[L]ay testimony may include inferences or opinions" if based on the witness's perceptions and helpful to understanding the witness's testimony. *State v. Ayala*, 178 Ariz. 385, 387 (App. 1994); *see also* Ariz. R. Evid. 701(a). The prosecutor's introductory question pertaining to Pearl's "line of work" did not seek to qualify her under Rule 702 to offer an expert opinion on the intent of contracting parties. *See State v. Peltz*, 242 Ariz. 23, 29, ¶ 18 (App. 2017) (approving lay witness opinion based on "training and experience" as well as "logic"). Pearl's testimony did not involve scientific, technical, or specialized knowledge implicating Rule 702. Rather, her testimony amounted to a reasonable inference based on her perception and personal knowledge. *See* Ariz. R. Evid. 701. Pearl's perception of Khorrami's motive assisted the jurors in determining whether Khorrami had deceived Pearl by falsely promising payment would ensure his silence. *See id.*

## V.     Jury Size

**¶52**         Citing *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), Khorrami argues—for the first time on appeal—he was unconstitutionally tried by an eight-person jury. A twelve-person jury "is not a necessary ingredient of 'trial by jury.'" *Williams v. Florida*, 399 U.S. 78, 86 (1970). Arizona's state constitution, however, guarantees criminal defendants a twelve-person jury in cases when the sentence authorized by law is death or imprisonment for thirty years or more. Ariz. Const. art. II, § 23; *see also* A.R.S. § 21-102.A. Otherwise, a criminal defendant may be tried with an eight-person jury. A.R.S. § 21-102.B. "Improper denial of a twelve-person jury is fundamental error that may provide a basis for relief even if not raised in the trial court." *State v. Kuck*, 212 Ariz. 232, 233, ¶ 8 (App. 2006).

**¶53**         Khorrami argues *Ramos* requires twelve-person juries in all criminal trials. In *Ramos*, however, the Supreme Court did not address *any* issue of constitutionally permissible jury size, much less overrule *Williams*. Rather, the Supreme Court said due process requires unanimous verdicts in criminal trials. *See Ramos*, 140 S. Ct. at 1397.

**¶54**         The Supreme Court "does not normally overturn . . . earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). We cannot conclude the Supreme Court silently changed a fundamental feature of its Sixth Amendment jurisprudence, particularly given the issue was neither raised nor litigated in *Ramos*. We decline Khorrami's invitation to reconsider the constitutionality of eight-person juries in Arizona.

## VI.    Cumulative Error

**¶55**         Finding no error in any of Khorrami's individual challenges, we discern no merit in his argument the cumulative effect of the asserted trial errors violated his due-process rights. *See State v. Bocharski*, 218 Ariz. 476, 492, ¶ 75 (2008) ("Absent any finding of [error], there can be no cumulative effect of [error] sufficient to permeate the entire atmosphere of the trial with unfairness.").

**CONCLUSION**

**¶56**     We affirm Khorrami's convictions.

